E-FILED
Tuesday, 14 April, 2015 04:10:14 PM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| RAYMOND D. DAVIDSON,<br>  Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>  Defendant. | Case No. 1:14-cv-01049-JES-JEH |

## REPORT AND RECOMMENDATION

Now before the Court is the Plaintiff's, Raymond D. Davidson's, Motion for Summary Judgment (Doc. 12) and the Commissioner of Social Security's, Carolyn W. Colvin's, Motion for Summary Affirmance (Doc. 16). The Plaintiff appeals from the denial of his application for Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 USC § 405(g). This matter has been referred for a Report and Recommendation. Text Order entered November 25, 2014. The Motions are fully briefed, and for the reasons stated herein, the Court recommends that the Commissioner's Motion for Summary Affirmance be DENIED and the Plaintiff's Motion for Summary Judgment be GRANTED.[1]

**I**

On July 25, 2011, Davidson filed a Title II application for DIB. Davidson alleged disability beginning on September 11, 2010, which he subsequently amended to July 25, 2011 at the hearing before the Administrative Law Judge. The claim was denied initially on August 29, 2011, and was then denied upon

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 10) on the docket.

1

reconsideration on October 5, 2011. On November 21, 2011, Davidson filed a timely request for hearing concerning his application for DIB. A hearing was held before the Honorable Diane Raese Flebbe (ALJ) on October 10, 2012, during which time Davidson was represented by an attorney. Following the hearing, the ALJ determined that Davidson was not disabled from July 25, 2011 to the date of the ALJ's Decision (October 26, 2012). Davidson's request for review by the Appeals Council was denied on December 12, 2013, making the ALJ's decision the final decision of the Commissioner. Davidson filed the instant civil action seeking review of the ALJ's decision on February 11, 2014.

## II

At the time Davidson applied for benefits, he was 40 years old and had previously worked as a construction dry waller. Davidson lived with his wife, daughter, and granddaughter in Peoria, Illinois. Davidson had his first seizure in 2009 and thereafter sought continued treatment for the seizures. On his Form SSA-3368, Davidson stated that the condition which limited his ability to work was epilepsy. (AR 147).

At the October 10, 2012 hearing before the ALJ, Davidson testified that he stopped working in September of 2010 because of his seizure disorder. He testified that he has gran mal seizures, of which he is aware, at least twice a month. He further testified that they leave him feeling very irritable and like he ran a marathon and he is then out for two days. He testified that he also has partial seizures that last for about five to ten minutes, four or five times a month, and they leave him feeling tired and fatigued for about an hour or so. He testified that there was nothing specifically that brought on his seizures and that he has had them in his sleep. As for sleep, Davidson testified that he has trouble sleeping and believes his medication is to blame. He further testified that his problems with memory and concentration are definitely caused by his

medication. He also testified that his medication causes blurry vision. He said that the antidepressant medications he tried made him angry so that he stopped taking them, and his doctor did not try to put him on any other antidepressants.

He testified to a typical day as getting up around 8:00 a.m., playing with his granddaughter, feeding her, doing the dishes, sitting around and watching TV, and reading books to his granddaughter. He testified to helping out with the laundry, spending time on the computer for about 10-15 minutes, and texting people. As for getting around, Davidson testified that he gets dizzy if he stands up quickly or stands too long, that he carries his granddaughter (weighing about 19 pounds) but otherwise does not lift anything, that he stopped driving, that he goes to church every Sunday, and that once in a while he goes to his sister's house. He testified that he was overweight which prevented him from moving as freely as he used to move. He testified to getting a headache every other day which would last a couple of hours and that he has previously wet himself when he had a seizure.

When questioned by his attorney about whether he would have any problem with a job where he was sitting down, Davidson testified that he would have a problem if he had a seizure on the job which would cause him to be off work for the next couple of days. The ALJ questioned Davidson about how much weight he could lift, and Davidson responded that he could lift 50 pounds, but that he was concerned about safety issues in doing so.

The ALJ went on to question Vocational Expert Randall Harding (VE) with the following hypothetical:

> I would like you to please assume no climbing ladders, ropes, or scaffolding; no work involving hazards such as dangerous machinery and unprotected heights; no work that requires operating a motor vehicle as part of the job performance. I would also like you to assume there's a need to limit climbing ramps and stairs to only

occasionally . . . I would also like you to assume, please, Mr. Harding, secondary to fatigue and side effects of medication that have been noted to include some memory and concentration issues, that work should be unskilled rather than having the demands of skilled or even semiskilled work. Would you please also limit work interaction with the general public to occasional, giving concerns over speech and word finding issues. And furthermore, even though DDS did not attribute a weight limit in assessing seizure hazards – precautions, let's limit to medium exertion work with concerns that it would be dangerous to have a seizure when holding 100 pounds. So, let's go ahead and assumed that. With these limits would Mr. Davidson be able to perform past work?

(AR 38-39). The VE responded that Davidson would not be able to perform past work. The ALJ then asked the VE whether other jobs existed that a person of Davidson's age, education, and work history could perform. The VE answered in the affirmative and identified jobs of hospital cleaner and laundry worker at the medium exertion level, small products assembly and mail clerk at the light exertion level, and circuit board assembler and addressing clerk at the sedentary exertion level. The ALJ also asked the VE whether the jobs would be available if such an individual were likely to miss work two days or more per month. The VE responded that based upon his opinion and experience, missing that amount of time would eliminate all job positions. The ALJ questioned the VE about whether any jobs would be available for such an individual who: 1) got to work every day; 2) on an unpredictable and unscheduled basis; 3) was likely to need to leave work at least twice a month; and 4) and on each occasion miss a half to two-thirds of the day. The VE responded that in terms of unskilled positions, there would be no jobs.

### III

Based upon all the medical evidence in the record, the ALJ determined that Davidson had the severe impairments of seizure disorder, obesity, and

depression. In finding that Davidson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, the ALJ addressed Listing 11.02 (convulsive epilepsy), Listing 11.03 (nonconvulsive epilepsy), the "paragraph B" criteria of Listing 12.04 (Affective Disorders), and the "paragraph C" criteria of Listing 12.04. The ALJ found that Davidson did not meet or equal Listing 11.02 or Listing 11.03 because:

> [I]t [was] not documented by detailed description of a typical seizure pattern, including all associated phenomena, occurring more frequently than once a month in spite of at least 3 months of prescribed treatment, and has not resulted in daytime episodes of loss of consciousness and convulsive seizures or nocturnal episodes manifesting residuals which interfere significantly with activity during the day, nor has it resulted in alteration of awareness or loss of consciousness and transient postictal manifestations or unconventional behavior or significant interference with activity during the day.

(AR 51-52). In terms of the "paragraph B" criteria of Listing 12.04, the ALJ detailed Davidson's activities of daily living to find that he had only mild restriction in that regard. The ALJ detailed the reasons for why Davidson was found to have mild to moderate difficulties in social functioning and moderate difficulties with regard to concentration, persistence, or pace. The ALJ also noted no episodes of decompensation, which had been of extended duration. Turning to the "paragraph C" criteria, the ALJ noted that Davidson did not meet those criteria.

Regarding Davidson's residual functional capacity (RFC), the ALJ concluded as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except: he cannot climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs; he must avoid hazards such as dangerous

5

machinery and unprotected heights; he cannot operate motor vehicles; and he is limited to unskilled work that requires no more than occasional work interaction with the general public.

(AR 53). In making the RFC determination, the ALJ detailed Davidson's testimony about his weight, alcohol consumption, and use of marijuana. The ALJ listed Davidson's daily activities to include taking care of his granddaughter, attending church, listening to music, sorting laundry, texting and making phone calls, using a computer, and taking a trip to Florida for ten days in May of 2012. The ALJ also discussed Davidson's testimony about when his seizures first started, what they entailed, how long they lasted, when they occurred, how he felt after them, and his medications for those seizures. Throughout her Decision, the ALJ noted how often Davidson reported to have experienced seizures.

In regard to Davidson's medications, the ALJ noted Davidson's testimony regarding their side effects. The ALJ also detailed Davidson's medical records, including those from his treating physician Dr. Erhan Ergene (neurologist), a consultation for surgical treatment, and a trip to the emergency room. Specifically from those medical records, among other things, the ALJ detailed Davidson's reports of memory problems and ability to remember, and the results of his physical examinations and neurologic examinations. The ALJ detailed the levels of Davidson's antiseizure medication that were in his system in July 2011, October 2011, November 2011, February 2012, and May 2012.

The ALJ, in concluding that the frequency of seizures that Davidson testified to was not supported by the medical records, discussed Davidson's reports of seizure occurrence that appeared in the medical records. The ALJ also discussed that the medical records reflected that Davidson was not always compliant with his seizure medication. Further, the ALJ noted that while

6

Davidson testified that he had not driven in a year, his medical records indicated that had told his doctor in March 2012 that he drove occasionally.

Elsewhere in her Decision, the ALJ identified testimony and records of evidence regarding Davidson's depression, she noted the VE's testimony, she discussed Dr. Ergene's Seizures Residual Functional Capacity Questionnaire, and she referenced the state agency physicians' opinions.

## IV

Davidson argues five points: 1) the ALJ erred in not finding that he met or equaled Listing 11.02 or 11.03; 2) the ALJ erred in concluding that he was seizure free; 3) the ALJ erred by failing to give controlling weight to the treating physician; 4) at Step 4 the ALJ failed to consider that it would not be safe to work if one has seizures; and 5) at Step 5, the ALJ erred because she did not review all evidence that Davidson can make an adjustment to other work with all of his noted problems.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000); *Pugh v Bowen*, 870 F2d 1271 (7th Cir 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 USC § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v Barnhart*, 297 F3d 589, 593 (7th Cir 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v Bowen*, 782 F2d 79, 82 (7th Cir 1986).

Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v Perales*, 402 US 389, 390 (1971), *Henderson v Apfel*, 179 F3d 507, 512 (7th Cir 1999).

Furthermore, determinations of credibility made by the ALJ will not be overturned unless the findings are clearly erroneous. *Anderson v Bessemer City*, 470 US 564, 573 (1985); *Imani v Heckler*, 797 F2d 508 (7th Cir 1986), cert denied, 479 US 988 580 (1986).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. See 20 CFR §§ 404.1566, 416.966 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 USC § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v Califano*, 614 F2d 142, 143 (7th Cir 1980). The factual determination is made by using a five-step test. See 20 CFR §§ 404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work; and

> 5) is unable to perform any other work existing in significant numbers in the national economy.

Id. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v Schweiker*, 732 F2d 605 (7th Cir 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v Heckler*, 779 F2d 1250 (7th Cir 1985); *Halvorsen v Heckler*, 743 F2d 1221 (7th Cir 1984).

### A

Davidson first argues that the ALJ erred in not finding that he met or equaled Listing 11.02 or 11.03. Davidson argues that, contrary to the ALJ's findings, the record documents observed seizures as required by the Listings. Davidson further argues that the ALJ erred in not soliciting testimony from persons other than himself, because Listing 11.02 states that testimony from persons other than the claimant is essential and that blood drug levels should be evaluated. Finally, he argues that the ALJ misstated his functioning capacity in rating the severity of his impairments when considering the "paragraph B" criteria. The Commissioner counters that Davidson cites to evidence from the time prior to his alleged onset date, that none of the evidence Davidson cites establishes a seizure pattern that occurred more than once a month, let alone more than once a week, and that he provides no authority for his assertion that the case should be remanded to seek information from witnesses to his seizures. The Commissioner additionally argues that Davidson does not explain how the

evidence he cites shows that he had marked restriction in daily activities, marked difficulties in social functioning, marked difficulties in concentration, persistence, or pace, or repeated episodes of decompensation.

> Listing 11.02 provides:
>
> Epilepsy—convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 CFR Part 404, Subpt. P, App. 1, § 11.02. Listing 11.03 provides:

> Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 CFR Part 404, Subpt. P, App. 1, § 11.03. The Commissioner correctly argues that none of the evidence cited by Davidson establishes a seizure pattern that occurred more than once a month in spite of at least 3 months of prescribed treatment as required by Listing 11.02, or more than once a week in spite of at least 3 months of prescribed treatment as required by Listing 11.03. The ALJ discussed the instances that Davidson reported that he had seizures, and the ALJ discussed what those seizures entailed both during and after they occurred. Relevant to Davidson's argument regarding his "blood drug levels," Listing 11.00A provides in pertinent part:

10

> Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. *When seizures are occurring at the frequency stated in 11.02 or 11.03*, evaluation of the severity of the impairment must include consideration of the serum drug levels.

20 CFR Part 404, Subpt. P, App. 1, § 11.00 (emphasis added). Because the ALJ determined that Davidson's seizures were not occurring at the frequency stated in 11.02 or 11.03, it was unnecessary for the ALJ to consider serum drug levels. Nevertheless, the ALJ *did* discuss Davidson's Dilantin[2] and Lamictal[3] levels in her Decision. See (AR 54, 55, 56). Further, Davidson makes contradictory arguments with regard to the ALJ's alleged error of failing to solicit testimony from others about the type and frequency of his seizures. He states that Listing 11.00[4] only requires one detailed description of a seizure provided by the physician who observed the seizure. Davidson argues that the "Video," a reference to the November 15, 2010 EEG monitoring that appears in the medical record, satisfied that listing. (AR 293-302). Yet Davidson next argues that the case should be remanded to seek information from witnesses to his seizures.

---

[2] Trademark for preparations of phenytoin: "an anticonvulsant used in the treatment of epilepsy other than the petit mal type, the treatment of status epilepticus, and the prevention and treatment of seizures associated with neurosurgery; administered orally. Called also diphenylhydantoin." *Dorland's Medical Dictionary*, dorlands.com/def.jsp?id=100081667 (visited Apr 14, 2015).

[3] Trademark for the preparation of lamotrigine: "an anticonvulsant used in the treatment of partial seizures in adult patients formerly treated with an enzyme-inducing anticonvulsant (e.g., carbamazepine) and as an adjunct in the treatment of partial seizures in adults with epilepsy and of generalized seizures associated with Lennox-Gastaut syndrome; it is also used as a mood stabilizer in the treatment of bipolar I disorder. Administered orally." *Dorland's Medical Dictionary*, dorlands.com/def.jsp?id=200011408 (visited Apr 14, 2015).

[4] Davidson cites to Listing 11.01, but that listing provides nothing more than "Category of Impairments; Neurological." 20 CFR Part 404, Subpt. P, App. 1, § 11.01.

Listing 11.00A provides, in relevant part, that "[t]estimony of persons other than the claimant is essential for description of type and frequency of seizures *if professional observation is not available*." 20 CFR Part 404, Subpt. P, App. 1, § 11.00 (emphasis added). Here, professional observation was available and so it was not essential for the ALJ to solicit testimony from witnesses to Davidson's seizures. Moreover, as the Commissioner notes, it is presumed that a claimant represented by counsel has made his best case before the ALJ. *Skinner v Astrue*, 478 F3d 836, 842 (7th Cir 2007). Error cannot be assigned to the ALJ for failure to solicit Davidson's wife's testimony where Davidson was represented by counsel at the hearing at which time third party witnesses could have been called to testify on Davidson's behalf.

With respect to the "paragraph B" criteria of Listing 12.04, Davidson cites to information within the record in support of his argument that the ALJ misstated his functioning capacity. As the Commissioner points out, Davidson cites to the information but does not explain how it shows that he had the requisite marked restrictions and difficulties. The ALJ's explanation for finding that Davidson did not satisfy the "paragraph B" criteria of Listing 12.04 was sufficiently articulated for the Court to trace the path of the ALJ's reasoning in this regard. See *Carlson v Shalala*, 999 F2d 180, 181 (7th Cir 1993) (requiring the ALJ to sufficiently articulate his assessment of the evidence to assure the court that the ALJ considered the important evidence and to enable the court to trace the path of the ALJ's reasoning). For activities of daily living, social functioning, and concentration, persistence, and pace, the ALJ explained why she determined that Davidson had only mild restriction, mild to moderate difficulties, and moderate difficulties, respectively. The ALJ also explained that Davidson had no episodes of decompensation of extended duration where he did not have any psychiatric hospitalizations and no treatment with a mental health professional

since the amended alleged onset date. (AR 52). While the ALJ may have "omitted" discussing some of the evidence of record, an ALJ is not required to evaluate in writing every piece of testimony and evidence submitted. *Carlson*, 999 F2d at 181.

Ultimately, the ALJ's finding at Step 3 is supported by substantial evidence which is evident from the ALJ's articulation of the relevant evidence of record. See *Curvin v Colvin*, 778 F3d 645, 650 (7th Cir 2015) (explaining that the ALJ's discussion of claimant's severe and non-severe impairments would not be discounted simply because it appeared elsewhere in the decision and finding that the ALJ's discussion at step 3 sufficiently met his duty to articulate when considered in light of his discussion of the claimant's RFC).

## B

Davidson next argues that the ALJ erred in concluding that he was seizure free where the ALJ noted Davidson's seizures in her Decision, where Davidson testified to seizures at the hearing, and where his MRI supports a causative factor for his seizures. The Commissioner disputes Davidson's characterization of the ALJ's Decision as one stating that Davidson was "seizure free." The Commissioner further argues that the ALJ reasonably determined that Davidson's allegations of disabling symptoms were not fully credible because they were not well supported by the objective medical evidence and were inconsistent with his contemporary reports to treatment providers.

Indeed, the ALJ did not state in her Decision that Davidson was "seizure free." Rather, the ALJ found that "[t]he frequency of seizures that the claimant testified to is not supported by the medical records." (AR 56). The Commissioner correctly points out that Davidson does not raise any argument concerning the ALJ's credibility finding and so the Court will not address that finding absent an argument.

13

While the Commissioner addresses Davidson's next "argument" that "[t]here is an inconsistency in the ALJ's reasoning as he [sic] finds his medications would create memory and concentration issues so limited him to unskilled medium work," the Court will not consider this "argument" where Davidson makes no actual argument in this regard. Rather than make any argument, Davidson merely made the statement and leaves it to the Commissioner and Court to decipher the contours of this "argument." Perfunctory and undeveloped arguments are waived. *Massuda v Panda Express, Inc*, 759 F3d 779, 783 (7th Cir 2014). As for Davidson's argument that there is inconsistency in the ALJ's reasoning as he suffers from a condition that will get worse over time, Davidson cites to an inapposite case and again leaves the argument undeveloped.

## C

In his third argument, Davidson states that the ALJ was not specific in her criticisms of treating physician Dr. Ergene's opinion, and that conclusory allegations[5] are not sufficient reason to disregard a treating physician's opinion. Davidson also takes issue with the fact that the ALJ gave more weight to the State doctors' reports where the doctors never reviewed the Seizures Residual Functional Capacity Questionnaire (Questionnaire) completed by Dr. Ergene and other significant evidence through 2012. Davidson finally argues that there is nothing contradicting Dr. Ergene and nothing supporting the ALJ's opinion. The Commissioner counters that the ALJ adequately explained her reasons for discounting Dr. Ergene's opinion and that Davidson otherwise fails to show that the ALJ erred in her evaluation of the medical source opinion evidence.

---

[5] The Court is uncertain why Davidson uses the word "allegations" when it appears that he is attempting to argue that the ALJ provided conclusory *reasons* for disregarding Dr. Ergene's opinion.

While an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v Astrue*, 532 F3d 606, 608 (7th Cir 2008), citing *Hofslien v Barnhart*, 439 F3d 375, 376 (7th Cir 2006). If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion. *Moss v Astrue*, 555 F3d 556, 561 (7th Cir 2009).

Here, in *not* affording Dr. Ergene's opinion significant weight, the ALJ stated:

> This opinion is not supported by the doctor's own records indicating 1-2 seizures a month, or the May of 2012 emergency department records indicating only three seizures since December of 2011 and three seizures that day after he had been off medication for a week. Dr. Ergene had also noted the claimant's subjective complaints of memory problems, but the doctor's own assessment was that the claimant's memory was intact. Further, the claimant's own reports of functioning do [sic] support a finding of disability under the Act and do not support Dr. Ergene's opinions. The claimant testified to the following daily activities: attending church, visiting his sister, sorting laundry, watching television, listening to music, reading books, using a cell phone and computer, and caring for and playing with his 1-year old granddaughter.

(AR 56-57). The Court is at a loss for why the Commissioner states that "the ALJ noted Dr. Ergene's opinion was contradicted by his own treatment notes that indicated that Plaintiff had one to two seizures a month" where the records cited conform with one another. The Questionnaire and INI Epilepsy Center Clinic

15

Progress Note indicate that Davidson had seizures 1 to 2 times per month. (AR 353, 375). While the Commissioner otherwise accurately identifies the discrepancies in the medical record about the frequency of seizures as reported by Davidson and that Davidson's memory was assessed as intact, the Commissioner does not point to any discussion by the ALJ in her Decision addressing the other factors she was to consider in finding that Dr. Ergene's opinion was not entitled to controlling weight.

Though an ALJ must only minimally articulate her reasons for discounting a treating physician's opinion, the ALJ must still consider the factors enumerated above when not giving the treating physician's opinion controlling weight. The ALJ's Decision does not indicate that she considered the length, nature, and extent of the treatment relationship; the frequency of examination; Dr. Ergene's specialty; or the types of tests performed. See *Elder v Astrue*, 529 F3d 408, 415 (7th Cir 2008) (explaining that if an ALJ discounts the physician's opinion after considering the enumerated factors, the Court must allow that decision to stand so long as the ALJ minimally articulated his reasons).

Further, in discounting Dr. Ergene's opinion, the ALJ was left with only the opinions of state agency physicians. Significantly, those state agency physicians did not have Dr. Ergene's Questionnaire to consider. In other words, the ALJ rejected the opinion of the only physician who actually examined and treated Davidson for his seizures.[6] Ultimately, the ALJ did not abide by the treating physician rule where the allegedly contradictory evidence (state agency physicians' opinions), which the ALJ favored, was not sufficiently developed as the state agency physicians lacked a crucial piece of the record – Dr. Ergene's

---

[6] Davidson was also seen by Dr. Patrick Tracy in November 2011 to discuss surgical treatment for his epilepsy. (AR 358-61). However, the medical records indicate just one visit to Dr. Tracy on November 1, 2011, and at that visit Davidson, his wife, and Dr. Tracy merely discussed the possibility of surgery to treat his epilepsy.

opinion. The Court cannot say that substantial evidence supports the ALJ's determination in rejecting Dr. Ergene's opinion given that the ALJ instead gave greater weight to the state agency consultants' opinions which were formed without consideration of the treating physician's opinion. This necessitates remand. Though the ALJ committed error requiring remand as discussed above, the Court must still consider Davidson's remaining arguments in order to determine whether the ALJ committed any other errors that must be addressed upon remand.

### D

Davidson next argues that the ALJ erred by finding that he had the RFC to perform any work given his seizures and that the RFC is inadequate as it is only minimally concerned with his safety. Davidson's argument in this regard is somewhat obtuse, but the Commissioner more clearly articulates it, together with the fifth issue Davidson raises (that the ALJ erred in that she did not review all evidence that he could make an adjustment to other work with all of his noted problems), as one contesting the ALJ's evaluation of the medical evidence and decision to discredit Davidson's allegations regarding the severity and limiting effects of his impairments.

Davidson would have the Court do what it may not; the Court may not substitute its judgment for that of the ALJ. *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000). The ALJ articulated her assessment of Davidson's allegations regarding the severity and limiting effects of his impairments sufficiently for the Court to trace the path of her reasoning in making the RFC finding that she did and which she presented to the VE. *Carlson*, 999 F2d at 181. The ALJ also articulated her assessment of the medical evidence. However, because the Court has determined that the ALJ committed legal error insofar as her application of the treating physician rule was insufficient, and because the ALJ's rejection of Dr.

Ergene's opinion was included as part of her evaluation of the medical evidence, the Court cannot say that the RFC finding is supported by substantial evidence. Thus, for the reasons set forth in Section IV.C. above, the ALJ should revise her RFC finding as necessary.

## V

For the reasons set forth above, the Court recommends that the Plaintiff's Motion for Summary Judgment (Doc. 12) be GRANTED and the Commissioner's Motion for Summary Affirmance (Doc. 16) be DENIED. The Court further recommends that this case be remanded pursuant to Sentence Four of 42 USC § 405(g) in order for the ALJ to address the factors enumerated above that she did not address in deciding how much weight to accord Dr. Ergene's opinion in her October 26, 2012 Decision, to articulate the weight she gives Dr. Ergene's opinion following that discussion, and to revise her RFC accordingly.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) working days after service of this Report and Recommendation. FRCP 72(b)(2); 28 USC § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v Zema Systems Corp*, 170 F3d 734, 739 (7th Cir 1999); *Lorentzen v Anderson Pest Control*, 64 F3d 327, 330 (7th Cir 1995).

Entered on April 14, 2015.

                                            s/Jonathan E. Hawley
                                          U.S. MAGISTRATE JUDGE